UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

LISA CONNER,                          )
                                      )
        Plaintiff,                    )
                                      )
        v.                            )        No. 4:17-cv-00021-AGF
                                      )
ASCENSION HEALTH and                  )
SEDGWICK,                             )
                                      )
        Defendants.                   )

## MEMORANDUM AND ORDER

This is an action under Section 502(a)(1)(B) of the Employee Retirement Income

Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), for disability benefits under an

employer sponsored disability benefit plan. This matter previously came before the

Court on cross motions for summary judgment filed by Defendants Ascension Health and

Sedgwick and by Plaintiff Lisa Conner. ECF Nos. 36 and 39. On June 19, 2018, the

Court denied the motions and remanded the case to the plan administrator for further

evaluation. Now, the parties have again filed cross motions for summary judgment

following the plan administrator's continued denial of disability benefits. The motions

have been fully briefed and are ready for disposition. For the reasons set forth below,

Defendants' motion for summary judgment will be granted in part and denied in part, and

Plaintiff's motion for summary judgment will be denied.

## BACKGROUND

This case arises out of the denial of long-term disability benefits. For the purposes

of the motions before the Court, the record establishes the following facts. Prior to May

2013, Plaintiff was employed at St. Vincent's Medical Center as a perioperative nurse,

and she was eligible to participate in the Ascension Health Long-Term Disability Plan

("LTD Plan"). The LTD Plan provides:

> Disability or disabled means that due to an Injury or Sickness which is supported by objective medical evidence, the Participant requires and is receiving from a Licensed Physician regular, ongoing medical care and is following the course of treatment recommended by the Licensed Physician; and . . . the Participant is unable to perform:
>
> (A)   during the first 24 months of Benefit payments, or eligibility for benefit payments, each of the Material Duties of the Participant's Regular Occupation;[1] and
>
> (B)   after the first 24 months of Benefit payments . . . any work or service for which the Participant is reasonably qualified taking into consideration the Participant's training, education, experience and past earnings.[2]

AH 62.[3]

Under the LTD Plan, "[t]he Claims Administrator [has] the discretionary authority

to decide all questions arising in connection with matters" set forth in the LTD Plan.

Further, the LTD Plan provides that "[a]ny interpretations or determinations made

pursuant to such discretionary authority of the Claims Administrator shall be upheld in

---

[1]   Subsection (A) will hereinafter be referred to as the "own occupation definition" of disability.

[2]   Subsection (B) will hereinafter be referred to as the "any occupation definition" of disability.

[3]   In light of the voluminous record, the Court will cite to documents as they have been identified by the parties.

judicial review unless it is shown that the interpretation or determination was an abuse of discretion." AH 74. In other words, the LTD Plan gives the Claims Administrator, in this case, Sedgwick, "discretionary authority to determine whether a Participant is eligible to receive or continue to receive a Benefit under the Plan . . . ." *Id.*

Plaintiff was involved in a motor vehicle accident on May 20, 2013, causing injuries to Plaintiff's neck, left shoulder, and left arm. Plaintiff was treated by her primary care physician, Dale Tucker, M.D., and she reported difficulties working due to her inability to concentrate and her worry that she would make a mistake. Plaintiff stopped working on May 22, 2013, after she was diagnosed with a rotator cuff tear and cervical strain and pain.

On September 27, 2013, Plaintiff exhausted short-term disability benefits, and her claim was converted to a claim for long-term disability ("LTD") benefits. Under the LTD Plan, a participant is eligible for benefits beyond 24 months only if she is disabled from any occupation for which she is reasonably qualified. Sedgwick approved Plaintiff's LTD claim on November 20, 2013, with benefits beginning on November 27, 2013 and ending on November 26, 2015.

Plaintiff identified her treating physicians as Dr. Tucker; Stephen Augustine, D.O., an orthopedic surgeon; Lynn Norman, D.O., an orthopedic surgeon who later replaced Dr. Augustine in the practice; and Stephen Kramarich, M.D., a spine and pain management physician. The medical records reflect the following.

In June 2013, Dr. Augustine performed surgery on Plaintiff's left shoulder to repair her rotator cuff, which was torn in the accident. On August 19, 2013, Dr.

Augustine completed a Fitness for Duty Certification stating that Plaintiff could return to work with a lifting restriction of 25 pounds. Sedgwick consulted with Ascension Health to determine whether it could accommodate such a restriction in Plaintiff's nursing job. Ascension Health responded that it could not accommodate that restriction, so Plaintiff remained off work.

In August 2013, Plaintiff began treating with Dr. Kramarich on a monthly basis to manage her pain following surgery. Dr. Kramarich's treatment notes reflect that Plaintiff experienced chronic pain in her neck, left shoulder, and left arm following the accident, and he prescribed medications to manage Plaintiff's pain. He also administered cervical epidural steroid injections between September and October 2013.

On November 11, 2013, Dr. Kramarich opined that Plaintiff remained disabled, but deferred comment on Plaintiff's limitations and return-to-work status to Dr. Tucker. On December 5, 2013, Plaintiff reported to Dr. Tucker that she was experiencing side effects from the medication that she had been prescribed. AH 326. Dr. Tucker's notes reflect that the dosage was reduced, and "[t]he side effects have completely resolved." *Id.* He also noted that physical therapy decreased Plaintiff's pain intensity.[4]

Plaintiff treated with Dr. Kramarich in January, February, and March 2014 to obtain refills of her pain medication. On February 3, 2014, Plaintiff saw Ashutosh Pradhan, M.D., a neurologist, for her neck pain. Dr. Pradhan found her neck range of

---

[4]     Plaintiff attended physical therapy until May 28, 2015. AH 770-828. However, the records are difficult to decipher, and neither party sets forth the contents of those records in their statements of material facts, instead citing to treating physicians' notes concerning Plaintiff's treatment. The Court will do the same.

motion to be "normal" and was "unimpressed" with the MRI of Plaintiff's cervical spine. Plaintiff never followed up with Dr. Pradhan.

On February 6, 2014, Plaintiff treated with Ronak Patel, D.O., and complained of continued aching and burning pain. Dr. Ronak noted that Plaintiff "is currently taking Norco with moderate pain relief and no side effects." AH 388.

On February 24, 2014, Plaintiff complained to Dr. Tucker about pain in her left shoulder and increased frequency of headaches. Dr. Tucker adjusted Plaintiff's medications after she complained of unsteadiness in the morning, and he was hopeful that the new medication would help with headaches.

Plaintiff's treatment records reflect that she continued to complain of left shoulder pain in March, April, July, and September 2014. On April 23, 2014, Dr. Norman noted that Plaintiff did not have much pain with range of motion and had fair strength in her arm at 30 degrees. Dr. Norman indicated on an April 25, 2014 disability update that Plaintiff may be able to return to work with light duty, which Dr. Norman would discuss with Plaintiff at her next appointment.

On September 9, 2014, Dr. Kramarich noted that Plaintiff was experiencing "signs and symptoms involving cognition," but he did not include any other description or notations. AH 497. That same day, Plaintiff underwent PHQ-9[5] and GAD-7[6] tests at

---

[5]     PHQ–9 is the nine-item depression scale of the Patient Health Questionnaire. The PHQ–9 is a tool for assisting primary care clinicians in diagnosing depression as well as selecting and monitoring treatment. *Castiner v. Astrue*, No. 2:10 CV 17 DDN, 2011 WL 902964, at *2 (E.D. Mo. Mar. 15, 2011).

[6]     The Generalized Anxiety Disorder Screener, GAD-7, is used to assess for

Riverside Pain Physicians, which reflected that Plaintiff was experiencing "minimal" depression (score 2/27) and "minimal anxiety" (score of 3/21). In the patient survey, Plaintiff reported no issues with concentration.

Dr. Kramarich's treatment notes from November and December of 2014 continue to include the "signs and symptoms involving cognition" notation with no further details. However, his notes between September 2014 and February 2015 reflect that Plaintiff was oriented to person, place, and situation; that Plaintiff's judgment and insight were seemingly intact; and that Plaintiff readily participated in decision-making and expressed understanding. The last notation reflecting any issues related to cognition appears on treatment notes from January 2015.

On December 2, 2014, Dr. Norman performed an arthroscopy, exploration, and debridement of Plaintiff's left shoulder. At a follow-up visit on January 25, 2015, Plaintiff reported that her left shoulder was feeling a little better.

During an office visit with Dr. Tucker on March 9, 2015, Plaintiff reported that she still experienced severe left shoulder pain, which had reduced her function and strength in her left arm. She reported that she had not been taking any medication since her shoulder surgery and requested that pain medication be prescribed to her. Dr. Tucker prescribed Celexa and noted, "I do not believe that patient can return to work." AH 609. He further noted that Plaintiff "continues to complain of severe left shoulder pain with range of motion deficits and some upper extremity weakness in that left arm. I do not

generalized anxiety disorder. *Blattenbauer v. Berryhill*, No. 3:18-CV-41, 2018 WL 7364817, at *4 (D.N.D. Dec. 13, 2018).

feel that the patient would be able to lift repetitively anything over 10 pounds. She would not be able to do any repetitive reaching, pushing, pulling, bending, or twisting." *Id.* Plaintiff again reported severe left shoulder pain on May 28, 2015, and Dr. Tucker increased the dosage of her Celexa prescription.

By letter dated April 9, 2015, Sedgwick informed Plaintiff that her benefits under the LTD Plan's "own occupation definition" of disability would terminate on November 26, 2015. The letter explained that after that date, Plaintiff would have to satisfy the "any occupation definition" of disability to receive continued LTD benefits. Sedgwick also asked Plaintiff to complete a Daily Activities Review.

On May 11, 2015, Plaintiff completed the Daily Activities Review, stating that she was able to walk without assistance for short distances and perform light housework. However, Plaintiff reported that she requires assistance washing and fixing her hair and dressing herself. She stated that she prepares meals about twice a week, but she cannot lift a pot of water or heavy pans. She could "do light shopping," but reported being unable to push a grocery cart due to left arm weakness and neck pain. She reported problems with concentration. Plaintiff complained of severe headaches that cause nausea and dizziness. She concluded that "[i]f I found a job that I could physically perform, my anxiety/depression, daily headaches, and medications that I take would prevent me from being a dependable employee." AH 586.

On June 1, 2015, Plaintiff saw Dr. Norman. Plaintiff reported pain on a scale of 5/10, depression, and pain in her left arm with neck pain radiating down her left arm. She also reported that the epidural injections were not helping with her forearm pain. Upon

physical examination of the left shoulder, Dr. Norman noted normal sensation in both hands, normal motor function in the hand and wrist, and fair strength in abduction with some mild discomfort.  AH 680.

On July 22, 2015, Dr. Kramarich prescribed MS Contin to Plaintiff to address her pain.  On July 31, 2015, Dr. Norman completed a form requested by Sedgwick, in which she opined that Plaintiff could sit for six hours, stand or walk for four hours, bend for one hour, stoop for less than one hour, crouch for ten minutes, perform gross handling or fine fingering for six hours, and could lift, carry, push, or pull a maximum of ten pounds.  AH 665.

On September 8, 2015, Plaintiff saw Dr. Tucker and reported that her medication had changed to MS Contin, which significantly relieved her pain but increased her level of sedation.  Dr. Tucker noted that "[Plaintiff] states that she does not feel comfortable driving due to the sedation.  She is able to perform her [activities of daily living] while taking the medication."  AH 716.

On September 23, 2015, Dr. Kramarich noted that Plaintiff continued to experience pain due to her cervical issues, and Plaintiff rated her pain intensity as 2/10.  Dr. Kramarich continued to prescribe MS Contin and Norco through April 2016.  On October 15, 2015, Dr. Tucker noted that Plaintiff denied experiencing headaches, was in no acute distress, and was alert and oriented.  On November 30, 2015, Plaintiff reported to Dr. Kramarich that she continued to have pain on her left side, with an average pain score of 2/10.  He reported that Plaintiff was doing "very well on the MS Contin."  AH 2171.  Upon examination, Dr. Kramarich noted that Plaintiff was oriented to person,

place, and situation; judgment and insight were seemingly intact; and that Plaintiff participated readily in decision-making and expressed understanding.

On November 12, 2015, Plaintiff underwent a functional capacity evaluation ("FCE"). The FCE indicated that Plaintiff was able to occasionally lift up to 20 pounds but was unable to reach overhead with her left upper extremity. The FCE concluded that Plaintiff was able to function in the light physical demand category. The FCE also noted that Plaintiff was taking a number of medications, including MS Contin for pain; Lortab for breakthrough pain; Zanaflex, a muscle relaxer; Celexa for depression; Estradiol for hormones; Fiorinal for migraines; and Xanax for sleep and anxiety. Plaintiff was driven to her FCE appointment by a family member due to her taking MS Contin. AH 853-867.

On November 30, 2015, Catherine Phillis-Harvey, MS, a certified vocational evaluator, completed an LTD transferable skills analysis ("TSA") on behalf of Sedgwick, which relied heavily on the FCE. The TSA identified multiple occupations suitable for Plaintiff's training, experience, education, and physical abilities, including nurse instructor, office nurse, school nurse, and nurse consultant. *Id*. at 388.

On December 4, 2015, Sedgwick terminated Plaintiff's LTD benefits based upon its review of the FCE, the TSA, and Plaintiff's medical records. Plaintiff appealed the decision on May 25, 2016, claiming, inter alia, that the side effects of her medications caused cognitive impairments. In support of her appeal, Plaintiff attached a psychological evaluation completed by Richard Nay, M.D., on February 4, 2016; more recent medical records from Dr. Tucker and Dr. Kramarich; and a vocational assessment ("VA") performed by Mark Capps, a vocational expert.

In his psychological evaluation of Plaintiff, Dr. Nay opined that Plaintiff demonstrated severe deficits in attention and concentration skills and had a very difficult time staying focused and remaining on task. AH 2009. Dr. Nay determined that Plaintiff "continues to be fully and totally disabled from a psychological perspective, and as such would not be able to perform any work on an 8-hour per day, 5-day per week basis." He concluded that it was "quite clear that medication side effects do play a significant role in her clinical presentation, particularly with respect to cognitive dysfunction and attention/concentration deficits." *Id*.

On December 31, 2015, Dr. Kramarich noted that Plaintiff "does report that she has noticed increased fatigue and reduced energy which she is attributing to the medication. She does mention some issues with short term memory however, unclear as to the medications part in this however, she feels that the pros of the medication is worth the perceived adverse side effects." AH 2176. In Plaintiff's more recent medical records, Dr. Kramarich confirmed that he had continued to prescribe Norco and MS Contin due to continued pain that Plaintiff had experienced since the May 2013 car accident. Dr. Tucker noted in his records that Plaintiff took morphine for chronic pain, which caused sedation and impaired judgment. Dr. Tucker also completed an interrogatory on April 4, 2016, in which he opined that "the medication [Plaintiff] takes would impair her cognitive function. She would be unable to work as a nurse or any other job." AH 2025.

In his VA performed on May 24, 2016, Mr. Capps opined that in light of Dr. Nay's psychological evaluation, Plaintiff could not perform any of the occupations

identified by the TSA due to her "cognitive/mental impairments and side effects of her medication." AH 2028. Specifically, he concluded that Dr. Nay's assessment revealed that Plaintiff could not perform the occupation of nurse consultant, nurse instructor, office nurse, or school nurse because all of those occupations are high skilled and require the ability to perform activities that Plaintiff cannot do, such as, inter alia, maintaining attention for two-hour segments and completing a normal workday without interruption from psychologically-based symptoms. He also noted that Plaintiff would be unable to perform certain work activities for more than 20% of the workday, including understanding, carrying out, and remembering very short and simple instructions, and sustaining an ordinary routine without special supervision. *Id.*

Plaintiff's appeal was reviewed on behalf of Sedgwick by Susan Orenstein, Ph.D., a board-certified psychologist, and Martin Mendelssohn, M.D., a board certified orthopedic surgeon. Dr. Orenstein opined that because there was no indication that Plaintiff was being treated for a mental health condition, Plaintiff did not suffer from "impaired functioning requiring restrictions or limitations due to a primary mental health condition." AH 2200. However, Dr. Orenstein specifically stated that she would "defer to another specialist regarding [Plaintiff's] primary medical conditions, medication side effects[,] and functioning as a result." *Id.*

Dr. Mendelssohn found that although Plaintiff had "ongoing self-reported complaints, a comprehensive history and physical examination indicating functional or neurological deficits is not provided that would substantiate the need for restrictions from November 27, 2015 through return to work." AH 2208. Thus, Dr. Orenstein and Dr.

Mendelssohn found no necessary restrictions or limitations on Plaintiff's ability to work. Sedgwick subsequently notified Plaintiff that its decision to terminate LTD benefits was upheld on August 1, 2016.

On November 1, 2016, Plaintiff filed this lawsuit, claiming that she was improperly denied continuing LTD benefits. On June 19, 2018, the Court held that Defendants failed to fully evaluate Plaintiff's claims that the side effects of the medication impacted her ability to perform work and that she was unable to perform any work in light of the limitations on her ability to reach. Thus, the Court remanded the case with directions to reopen the administrative record for further evaluation.

Plaintiff asked C. Kimball Heartsill, a vocational expert, to review the November 30, 2015 TSA prepared by Ms. Phillis-Harvey and complete an independent TSA. Mr. Heartsill concluded that the jobs identified in Ms. Phillis-Harvey's report would not be within Plaintiff's functional capacity because Plaintiff's training, education, and experience would not allow for the performance of the occupation of nurse instructor, and her physical limitations would not allow Plaintiff to perform the occupations of office nurse, nurse consultant, or school nurse. AH 2708.

On August 8, 2018, Ms. Phillis-Harvey updated her report in light of Mr. Heartsill's TSA. She opined that because Plaintiff has sixteen years of experience as a nurse, she would be qualified to teach nursing classes, such as nursing assistant classes, medical terminology, and anatomy, without additional training. AH 4476. Ms. Phillis-Harvey further maintains that based on the limitations contained in the FCE, the occupations of school nurse, office nurse, and nurse consultant would permit Plaintiff to

change positions between sitting, standing, and walking during the course of doing her job duties, thus accommodating her physical limitations.

Dr. Mendelssohn also performed a supplemental review of his July 20, 2016 report in light of the Court's concerns regarding Plaintiff's medication and her ability to reach, and he reviewed additional medical records from Plaintiff's physicians. Ah 4441-4450. He opined that the prescription and use of medication does not constitute documentation of the presence or severity of impairment in functioning. He concluded that in the absence of findings from examinations that speak to Plaintiff's functioning as of November 27, 2015, no impairments are supported.

Dr. Mendelssohn further concluded that although Plaintiff reported radiating pain, "a clinical examination noting degrees of the restriction in the range of motion of her shoulder or weakness of her rotator cuff is not documented." AH 4446. He opined that diagnostic studies do not correlate with Plaintiff's complaints. Dr. Mendelssohn thus concluded that in the absence of quantified findings from physical examinations confirming the presence and severity of an impairment, the need for restrictions or limitations was not supported.

On August 24, 2018, Dr. Mendelssohn again supplemented his report after reviewing the TSA reports of Ms. Phillis Harvey and Mr. Heartsill. He noted that Mr. Heartsill's opinions were based on Plaintiff's self-reported complaints, as well as Plaintiff's responses to activities that were needed to do a functional capacity examination, which could be self-limited. Dr. Mendelssohn concluded that his own opinion that Plaintiff "can return to her regular unrestricted occupation as a Registered

Nurse for the period of November 27, 2015 through return to work" was unchanged.  AH 4449.

Dr. Orenstein also supplemented her report in light of the Court's Order.  She opined that there were no specific observations from Plaintiff's providers related to Plaintiff's cognitive defects to support any limitations.  She opined that the first mention of specific cognitive deficits was noted in Dr. Nay's psychological testing, which determined that Plaintiff experienced cognitive defects as a result of her medications.  Dr. Orenstein noted, however, that it is not clear whether those effects were due to Plaintiff's pain medications or psychotropic medications, such as anti-anxiety medications.  Dr. Orenstein concluded that to make a more detailed determination regarding the role of medications, it would be necessary for Plaintiff to abstain from Xanax and re-take the test.  Dr. Orenstein also believed that further neuropsychological testing was warranted to determine the severity of Plaintiff's problems with attention and concentration.

Dr. Orenstein also noted that Plaintiff's providers never mentioned any impairment due to a mental health condition, nor did their notes reflect observations of Plaintiff having difficulty with cognitive functioning, social interactions, or activities of daily living.  Dr. Orenstein pointed out that no physician referred Plaintiff to psychotherapy or recommended a higher level of care to address any mental condition.  Thus, Dr. Orenstein concluded that she "did not find clinical evidence for impairment based on [Plaintiff's] mental health condition alone."  AH 4470.  She did not, however, opine whether the side effects of Plaintiff's medication caused any impairment, as it was outside her expertise.

On August 24, 2018, Dr. Orenstein provided an addendum after reviewing the TSA reports prepared by Mr. Heartsill and Ms. Phillis-Harvey. Dr. Orenstein noted that Mr. Heartsill did not mention Plaintiff needing any restrictions or limitations due to a mental health condition, and she concluded that "there remains no clinical evidence supporting functional impairment due to a primary mental health condition." AH 4472.

Sedgwick requested an additional review of the medical record by Howard Grattan, M.D., a specialist in pain management, physical medicine, and rehabilitation. On August 24, 2018, Dr. Grattan prepared a report concluding that the medical records did not support any restrictions or limitations on Plaintiff. He opined that on November 30, 2015, Plaintiff reported "doing very well" on MS Contin. Dr. Grattan noted that Plaintiff was alert and oriented and in no acute distress. He further opined that "the goal of pharmacological management is for increased function." He stated that "if the current medication is not resulting in increased functionality", a treating physician would rotate Plaintiff "to a more tolerable agent" to allow her to function. He noted that there was no evidence of Plaintiff's medication being altered, which would be appropriate if it were necessary to achieve increased functioning. AH 4395.

With regard to Plaintiff's ability to reach, Dr. Grattan opined that the progress notes did not describe a comprehensive neurological or musculoskeletal examination, and thus the medical evidence did not support activity restrictions for the time frame under review. Specifically, the progress notes did not describe any significant musculoskeletal or neurological abnormalities that would rise to the level of functional impairment resulting in restrictions or limitations.

On November 1, 2018, after reviewing the entire medical record and the reports prepared by Dr. Mendelssohn, Dr. Orenstein, and Dr. Grattan, Sedgwick advised Plaintiff of its decision to uphold the denial of her claim. Sedgwick noted that although Dr. Kramarich and Dr. Nay reported that Plaintiff required medication for ongoing symptoms, which rendered her unable to work, their records contained no documentation of a clinical examination correlating with Plaintiff's complaints in this regard. Further, it determined that the degree of Plaintiff's cognitive defects was not determined by the testing provided, and there was no other evidence in the record that Plaintiff's mental health conditions, i.e. mood disorder and anxiety, were impairing.

Sedgwick further found that a "clinical examination noting degrees of the restriction in the range of motion of her shoulder or weakness in her rotator cuff were not documented." AH 4514. Further, "[t]he diagnostic studies provided included MRIs of the cervical spine and lumbar spine[,] however the findings from these studies do not correlate with [Plaintiff's] complaints." *Id.* Sedgwick noted that the record was devoid of any postoperative complications, nor was there a comprehensive examination by Plaintiff's surgeon or physical therapist demonstrating an inability to reach overhead or marked weakness. Sedgwick thereafter concluded that Plaintiff could "return to her regular, unrestricted occupation as a Registered Nurse for the period of November 27, 2015 through return to work." AH 4515.

On March 1, 2019, Plaintiff filed a renewed motion for summary judgment, arguing that: (1) Sedgwick failed to offer any reasonable explanation for denying benefits in light of the overwhelming evidence in the record that Plaintiff experienced limitations

on her ability to work; (2) Sedgwick's new conclusion that Plaintiff has no limitations on her ability to work is an abuse of discretion; and (3) Sedgwick again failed to properly recognize the side effects of Plaintiff's medications on her ability to work. Sedgwick, in its cross motion for summary judgment, maintains that its determination was reasonable in light of the record as a whole, the opinions of its reviewing physicians, and the TSA prepared by Ms. Phillis-Harvey. Sedgwick also seeks summary judgment on its counterclaim, which asserts that Plaintiff owes Sedgwick for overpayments made while Plaintiff was receiving social security benefits. Plaintiff did not respond to this portion of Sedgwick's motion.

## DISCUSSION

### Standard of Review

"Summary judgment is appropriate when, viewing the facts in the light most favorable to the non-movant, there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law." *Metro. Prop. & Cas. Ins. Co. v. Calvin*, 802 F.3d 933, 937 (8th Cir. 2015) (citation omitted). On a motion for summary judgment, facts and all reasonable inferences must be construed in favor of the nonmoving party; however, "facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (citation omitted). "The nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts, and must come forward with specific facts showing that there is a genuine issue for trial." *Briscoe v. County of St. Louis, Mo.*, 690 F.3d 1004, 1011 (8th Cir. 2012) (citations omitted). The

movant is entitled to summary judgment when the nonmovant has failed "to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

## ERISA Standard

"In general, a claim administrator's denial of benefits is subject to de novo review by the district court. Where the plan grants the administrator or fiduciary 'discretionary authority' to determine eligibility for benefits, however, the standard of review is relaxed, and abuse of discretion becomes the appropriate benchmark." *Cooper v. Metro. Life Ins. Co.*, 862 F.3d 654, 660 (8th Cir. 2017). "To determine whether the benefit plan gives the administrator or fiduciary discretionary authority, courts must look for explicit discretion-granting language in the policy or in other plan documents." *McKeehan v. Cigna Life Ins. Co.*, 344 F.3d 789, 793 (8th Cir. 2003) (citations omitted). Here, the LTD Plan at issue includes the requisite language triggering the Court's abuse of discretion standard. *See Cooper*, 862 F.3d at 660.

Under the abuse of discretion standard, the Court will uphold a claim administrator's decision so long as it is reasonable and supported by substantial evidence. *Hampton v. Reliance Standard Life Ins. Co.*, 769 F.3d 597, 600 (8th Cir. 2014). "A decision is reasonable if a reasonable person could have reached a similar decision, given the evidence before him, not that a reasonable person would have reached that decision." *Ingram v. Terminal R.R. Ass'n of St. Louis Pension Plan for Nonschedule Emps.*, 812 F.3d 628, 634 (8th Cir. 2016) (citation omitted). The court must not substitute its own weighing of the evidence for that of the decision-maker. *Gerhardt v. Liberty Life Assur.*

*Co. of Boston*, 736 F.3d 777, 780 (8th Cir. 2013).

Upon careful consideration of the record before it, the Court cannot say that Sedgwick abused its discretion in denying Plaintiff LTD benefits. As noted above, Sedgwick approved Plaintiff's claim for LTD benefits for the entire 24-month period of disability allowable under the "own occupation" standard. After 24 months, the standard shifts to the "any occupation" definition of disability, which is broader than the "own occupation" standard.

Plaintiff's FCE, performed in November 2015, reflected that she could occasionally lift up to twenty pounds floor to waist, push and pull ten pounds of force, stand and sit frequently, walk occasionally, climb stairs occasionally, engage in constant object handling and fingering, and occasionally reach floor level. It determined that Plaintiff could not reach overhead with her left upper extremity. Plaintiff's medical records indicate that although Plaintiff continued to experience some pain due to her left shoulder and neck, Plaintiff was "doing well" on her pain medications, and evaluations of Plaintiff's range of motion were generally normal. A TSA performed by Ms. Phillis-Harvey, which accounted for any limitations in Plaintiff's ability to reach, concluded that Plaintiff could work as a nurse instructor, school nurse, office nurse, or nurse consultant. Ms. Phillis-Harvey noted that these occupations would allow Plaintiff to change positions often, and Plaintiff's sixteen years as a nurse made her well-qualified for those occupations.

Sedgwick relies heavily on the opinions of its retained experts, Dr. Orenstein, Dr. Mendelssohn, and Dr. Grattan. Cumulatively, those reports conclude that, based upon

the objective findings in her medical records, Plaintiff is not limited by any mental or physical condition. Dr. Mendelssohn and Dr. Grattan specifically reviewed Plaintiff's records to determine whether the side effects of any medications were disabling. Although Plaintiff complained of side effects that might have been the result of medications, Sedgwick reasonably relied on Dr. Grattan's opinion if the side effects were debilitating, Plaintiff's treating physicians would have adjusted the dosage or explored alternative medications. Further, with the exception of one medical record noting decreased flexion, extension, and abduction of the left shoulder, the record generally lacks evidence of severe limitations in Plaintiff's range of motion after her shoulder surgeries. And, assuming that Plaintiff is unable to reach, the occupations identified by Ms. Phillis-Harvey account for that limitation.

Although Dr. Kramarich and Dr. Tucker submitted interrogatories stating that Plaintiff could not return to work, Sedgwick did not err when it relied on the opinions of its reviewing physicians. "When there is a conflict of opinion between a claimant's treating physicians and the plan administrator's reviewing physicians, the plan administrator has discretion to deny benefits unless the record does not support denial." *Johnson v. Metropolitan Life Ins. Co.*, 437 F.3d 809, 814 (8th Cir. 2006) (citation omitted). Moreover, as pointed out by the reviewing physicians, Plaintiff relies solely on her own subjective complaints as evidence of her disability.

Even if the Court's interpretation of the submitted medical evidence may not have been identical to that of the adjudicators for Sedgwick, the Court's interpretation need not be the same as the claim administrator. *Presi v. Ascension Health Alliance*, No.

4:16CV01857JCH, 2019 WL 1200347, at *14 (E.D. Mo. Mar. 14, 2019). This Court

"may not simply substitute its opinion for that of the plan administrator." *Fletcher-*

*Merrit*, 250 F.3d 1174, 1180 (8th Cir 2001). In this case, Sedgwick gave detailed reasons

for denying Plaintiff's LTD claim, clearly pointed to the basis for its decision, and noted

Plaintiff's lack of objective support for her claimed disability. Upon consideration of the

record before it, the Court cannot say that Sedgwick abused its discretion in denying the

Plaintiff's claim for LTD benefits. The denial of benefits based upon lack of objective

evidence of the Plaintiff's disability is not unreasonable. *See Coker v. Metro. Life Ins.*

*Co.*, 281 F.3d 793, 799 (8th Cir. 2002) (holding that providing only subjective medical

opinions, which were unsupported by objective medical evidence, did not suffice to prove

a claim for benefits); *see also Prezioso v. Prudential Ins. Co. of Am.*, 748 F.3d 797, 806

(8th Cir. 2014) (same). The record reflects that there exist occupations which Plaintiff

may be reasonably qualified to perform. After careful review, the Court concludes that

Sedgwick's denial of LTD benefits under the Plan reasonable and supported by the

medical evidence.

Sedgwick also seeks summary judgment on its counterclaim, which seeks the

reimbursement of overpayments resulting from Plaintiff's receipt of social security

benefits. Plaintiff did not file any opposition to this aspect of the motion. However,

"when a plaintiff fails to respond adequately to a motion for summary judgment, a district

court should not treat such a non-response as sufficient to dispose of the motion." *Buck*

*v. Am. Family Mut. Ins. Co.*, No. 4:12CV1879 SNLJ, 2014 WL 272343, at *2 (E.D. Mo.

Jan. 24, 2014) (citations omitted). "Courts should proceed to examine those portions of

the record properly before them and decide for themselves whether the motion is well taken." *Id.* (citation omitted).

The Eighth Circuit has affirmed the reimbursement by an employee beneficiary of an overpayment by an ERISA Plan administrator. *See Dillard's Inc. v. Liberty Life Assurance Co. of Boston*, 456 F.3d 894 (8th Cir. 2006). The record reflects that on December 4, 2016, Plaintiff received a retroactive Social Security Award of $39,366 for the period of November 2013 through November 2016. ECF No. 30 at 53. Sedgwick contends that during this period, it made overpayments in the amount of $22,792.44. However, there is no affidavit or other evidence in the record supporting the amount overpaid or how the calculation was made. Accordingly, to the extent Defendants seek reimbursement for any overpayments made to Plaintiff, the motion will be denied.

**CONCLUSION**

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiff's renewed motion for summary judgment is **DENIED**. ECF No. 74.

**IT IS FURTHER ORDERED** that Defendants' motion for summary judgment is **GRANTED IN PART and DENIED IN PART**, as set forth in this Order.

**IT IS FURTHER ORDERED** that, on or before **January 15, 2020**, the parties shall submit a joint proposed schedule for Defendants' counterclaim.

_____
AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated this 26th day of December 2019.